# EXHIBIT "C"

{N0790233.1 }

2015 WL 5854134
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Churchill Downs, Inc., Plaintiff,
v.
NLR Entertainment, LLC and Nicholas L. Ribis,
Defendants/Third–Party Plaintiffs,
v.
William Carstanjen, Third–Party Defendant.

Civ. No. 14–03342(KM)(MAH)
|
Signed 10/05/2015

**Attorneys and Law Firms**

Cathleen Marie Devlin, Patrick Francis Nugent, Saul Ewing LLP, Philadelphia, PA, Ryan L. Di Clemente, Saul Ewing LLP, Princeton, NJ, for Plaintiff/Third–Party Defendant.

James J. DiGiulio, Joseph P. LaSala, William F. O'Connor, Jr., McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for Defendants/Third–Party Plaintiffs.

**OPINION**

MCNULTY, U.S.D.J.,

*1 The plaintiff, Churchill Downs, Inc. ("CDI"), has brought this action for breach of contract and fraud against NLR Entertainment, LLC ("NLR") and NLR's principal, Nicholas L. Ribis. The action arises from the breakdown of the parties' business relationship after NLR failed to acquire a casino in Atlantic City, New Jersey, for which CDI was to provide online internet gambling services. NLR and Ribis have asserted counterclaims against CDI for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation. NLR and Ribis have also brought a third-party claim of defamation against CDI's president and chief operating officer, William Carstanjen.

Now before the Court are the following motions. Carstanjen has moved to dismiss NLR and Ribis's Third–Party Complaint as procedurally improper under Federal Rule of Civil Procedure 14(a), and also for failure to state a claim under Rule 12(b)(6). CDI has moved for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). CDI's motion seeks an immediate award of $2.5 million in liquidated damages on Count 1 of the Complaint (breach of contract), as well as dismissal of NLR and Ribis's counterclaims.

For the reasons expressed below, the motions will be denied. The allegations of the counterclaims and third-party claims, although quite thin, are sufficient to merit further exploration in discovery. The Third–Party Complaint, although improper under Rule 14(a), is properly brought under Rules 13 and 20. CDI's motion for judgment on Count 1 of its complaint will be denied without prejudice as premature.

Although I am denying these motions, I write at some length to orient the parties' anticipated motions for summary judgment at the close of fact discovery. Fact discovery, which was not stayed while these motions were pending, appears to be close to completion. (*See* Dkt Nos. 40–43)

**Background**

**A. *License Agreement***
In 2013, CDI and NLR began negotiating a business deal whereby CDI would develop and maintain an online gaming service for the Showboat Atlantic City Hotel and Casino in Atlantic City, New Jersey ("Showboat"). At the time, NLR did not own Showboat, but was looking to acquire it from Caesars Entertainment Corporation ("Caesars"). (Compl.¹ ¶¶ 8–10; 3PCC ¶ 9) On August 4, 2013, CDI and Ribis (on behalf of NLR), signed a binding term sheet, and pursuant to that term sheet, CDI paid $2,500,000 to NLR. (Compl. ¶ 11; Answer ¶ 11; 3PCC ¶ 15) A month later, on September 4, 2013, Ribis (this time on behalf of NLR's wholly owned subsidiary, NLR Acquisitions, Inc.) entered into a License and Operating Agreement ("License Agreement") with Churchill Downs Interactive Gaming, LLC, a wholly-owned affiliate of CDI. (Compl. ¶ 12; Answer ¶ 12; 3PCC ¶ 16; *see also* Dkt. No. 20–1)

*2 Under the terms of the License Agreement, CDI would operate as "the exclusive vendor to Showboat of internet gaming and online gambling services after the consummation of NLR's acquisition of Showboat." (License Agreement, p. 1; 3PCC ¶¶ 17–18) NLR was obligated to "execute a definitive agreement to acquire

Showboat by October 15, 2013 and consummate the transactions contemplated thereby by January 31, 201[4]."[2] (*Id.* § 3(i)) For its part, CDI was to use best efforts to "launch" the online gaming system by April 2, 2014. (*Id.* § 3(h)) The License Agreement also provides that "[o]n the first Business Day following the date NLR enters into a definitive agreement to acquire Showboat ... CDI shall deposit $7,500,000" into an escrow account as a "Rights Fee." (*Id.* § 10(e)(i)) That Rights Fee provision further states that "NLR is permitted to use $1,000,000 of escrowed funds as a deposit ... for the acquisition of Showboat." (*Id.*) If NLR failed to consummate the acquisition of Showboat by January 31, 2014, the License Agreement awarded CDI liquidated damages in the amount of $2,500,000. (*Id.* § 10(d)(i)) If CDI failed to launch the internet gaming system by April 2, 2014, the License Agreement awarded NLR liquidated damages of $10,000 per day until the gaming system is launched, unless the failure to launch the system was due to the failure of one of the parties to obtain the requisite gaming approvals. (*Id.* § 10(d)(ii)) Finally, the License Agreement specified that it would be governed under the laws of New Jersey. (*Id.* § 19(a))

In the months after the License Agreement was signed, CDI took steps to develop the online gaming system, including hiring 20 new engineers and investing $10 million in intellectual property. (Compl. ¶ 15) During this time, Ribis assured CDI that a deal to acquire Showboat from Caesars was close to closing. (Compl. ¶¶ 16, 18, 20) However, NLR did not execute a definitive agreement to acquire Showboat by October 15, 2013. (Compl. ¶ 17) In December 2013, Ribis informed CDI that he was ready to sign an asset purchase agreement for Showboat and emailed CDI a draft press release relating to the sale. (Compl. ¶ 25; 3PCC ¶ 24) Ribis requested that CDI place $7.5 million in escrow to assist him in the acquisition of Showboat, but CDI refused. (Compl. ¶¶ 25–26; 3PCC ¶ 25) In early January 2014, CDI learned that Caesars was no longer in negotiations to sell Showboat to NLR. (Compl. ¶ 28) Ribis and NLR did not, as provided by the License Agreement, consummate the Showboat acquisition by January 31, 2014, or indeed at any time. (Compl. ¶ 33; 3PCC ¶ 27) In short, the deal between CDI and NLR broke down.

On May 13, 2014, CDI announced a partnership agreement with Saratoga Casino 8b Raceway ("Saratoga") to build a casino in New York. (3PCC ¶ 29) At some point, Carstanjen called Ribis a "fraud and a thief who could not be trusted." (*Id.* ¶ 32)

**B. *Procedural History***

On February 3, 2014, CDI filed in Kentucky state court a complaint alleging causes of action for breach of contract and fraud and seeking the return of the $2.5 million down payment. (Dkt. No. 1 ¶ 1) On February 25, 2014, NLR and Ribis removed the action to the United States District Court for the Western District of Kentucky on the basis of diversity jurisdiction. (*Id.*) NLR and Ribis then moved to dismiss the complaint for lack of personal jurisdiction or, in the alternative, to transfer venue to the United States District Court for the District of New Jersey. (Dkt. No. 6) The motion to dismiss was denied, but the action was transferred to this court on May 27, 2014. (Dkt. No. 9) On May 30, 2014, NLR and Ribis then answered the complaint, asserted counterclaims against CDI, and filed a Third–Party Complaint against Carstanjen. (Dkt. No. 11) CDI answered the counterclaims on July 7, 2014. (Dkt. No. 20) On July 25, 2014, Carstanjen filed a motion to dismiss the Third–Party Complaint. (Dkt. No. 22) CDI filed its motion for partial judgment on the pleadings on August 8, 2014. (Dkt. No. 24)

## DISCUSSION

The Answer of NLR and Ribis contains Counterclaims (against plaintiff CDI) and a Third–Party Complaint (against Carstanjen). Counts One and Two (breach of contract and breach of the covenant of good faith and fair dealing) are asserted only as counterclaims against CDI. I discuss CDI's Rule 12(c) motion to dismiss Counts One and Two in section A. Count Three (Defamation/Trade Libel/ Slander) is asserted both as a counterclaim against CDI and as a third-party claim against Carstanjen.[3] I discuss the motions of CDI and Carstanjen to dismiss Count Three in section B. Finally, CDI moves for entry of judgment on the pleadings in the amount of $2.5 million on its claim of breach of contract (Count 1 of the complaint). I discuss that motion in section C.

**A. Rule 12(c) Motion for Judgment on the Pleadings—Counts One and Two of the Counterclaim**

**i. Legal standard**

*3 As to Counts One and Two of the Counterclaim, CDI (as counterclaim defendant) moves for judgment on the pleadings under Federal Rule of Civil Procedure Rule 12(c). For these purposes, a Rule 12(c) motion is indistinguishable from a motion to dismiss. Federal Rule

of Civil Procedure 12(h)(2) "provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir.1991). Accordingly, when a Rule 12(c) motion asserts that the complaint fails to state a claim, the familiar Rule 12(b)(6) standard applies. *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir.2005). In deciding a Rule 12(b)(6) motion, a court must take the allegations of the complaint as true and draw reasonable inferences in the light most favorable to the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008) (traditional "reasonable inferences" principle not undermined by *Twombly, see infra*).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiffs right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir.2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

In deciding a motion to dismiss, or for a similar judgment on the pleadings, the court can consider documents integral to or explicitly relied upon in the pleadings. *See In re Burlington Coat Factory Sec. Lit.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir.2003) ("[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered.")

### ii. Breach of contract, breach of implied covenant of good faith and fair dealing

To plead a claim for breach of contract under New Jersey law, a party must allege (1) the existence of a contract; (2) that the contract was breached; (3) that the breach resulted in damages. *See Danish LLC v. Macy's Inc.*, 2012 WL 2576358, at *2 (D.N.J. July 3, 2012). Also sometimes identified as an essential element is (4) that the party suing for breach performed its own contractual duties. *Id.* To satisfy Rule 8(a), a complaint must identify the portions of the contract that were allegedly breached. *See Faistl v. Energy Plus Holdings, LLC*, 2012 WL 3835815, at *7–8 (D.N.J. Sept. 4, 2012).

*4 Breach of the explicit terms of a contract, however, is not the only kind of breach. A covenant of good faith and fair dealing is implied in every contract in New Jersey. *See Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J.1997). A party may breach that implied covenant even when its actions do not violate a pertinent express term. *Id.* New Jersey has recognized an independent cause of action for breach of the implied covenant in three situations: "(1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance." *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, 2006 WL 2162435, at *9 (N.J.Super.Ct.App.Div. Aug. 3, 2006) (affirming dismissal of good faith and fair dealing claim as redundant of breach of contract claim where no facts suggested a pretext). A cause of action may lie where "the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.*, 798 A.2d 1251, 1262 (N.J.2002). "[P]roof of bad motive or intention is vital to an action for breach of the covenant." *Westmont Dev. Grp., LLC v. Twp. of Haddon*, 625 F.Supp.2d 178, 195 (D.N.J.2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J.2005)).

There is no dispute in the pleadings that CDI and NLR entered into a binding term sheet on August 4, 2013. (Compl. ¶ 11; Answer ¶ 11; 3PCC ¶ 15) The parties do not dispute that pursuant to that term sheet, CDI paid $2.5 million to NLR. (Compl. ¶ 11; 3PCC ¶ 15) Similarly, the parties do not dispute that CDI and NLR signed the License Agreement on September 4, 2013. (Compl. ¶ 12; Answer ¶ 12; 3PCC ¶ 16) Nor is there disagreement as to the purpose of the License Agreement, which was for CDI

to develop an internet gaming and online gambling system for use at the Showboat casino, once Showboat was acquired by NLR. (Compl. ¶ 11; 3PCC ¶ 17)

There is no doubt that NLR was obligated to "execute a definitive agreement to acquire Showboat by October 15, 2013 and consummate the transactions contemplated thereby by January 31, 201[4]." (License Agreement § 3(i)) CDI was to use its best efforts to go live with the online gaming system within about two months of that acquisition, *i.e.*, by April 2, 2014. (*Id.* § 3(h)) The License Agreement also provides that on the business day following NLR's entrance into a "definitive agreement to acquire Showboat," the parties shall enter into an agreement to establish an escrow account wherein CDI will deposit $7,500,000. (*Id.* § 10(e)(i)) Of that amount, "NLR is permitted to use $1,000,000 of escrowed funds as a deposit ... for the acquisition of Showboat." (*Id.*)

The real dispute here is over which party breached first. CDI contends that NLR breached the License Agreement by failing to acquire the Showboat by January 31, 2014, and that CDI was therefore excused from further performance and is entitled to recover its $2.5 million down payment. NLR, by way of counterclaim and defense, alleges that it was CDI who breached the License Agreement by failing to provide the $7.5 million NLR needed to purchase the Showboat and by failing to launch the gaming platform by April 2, 2014. NLR further counterclaims that CDI's failure to cooperate was bad faith conduct that defeated the purpose of the agreement and breached the implied covenant of good faith and fair dealing.

There is no dispute that NLR failed to execute a written agreement to acquire Showboat by October 15, 2013, and it failed to consummate the acquisition of Showboat by January 31, 2014. There is similarly no dispute that CDI failed to place $7.5 million in escrow and failed to launch the gaming platform by April 2, 2014.

Were these material breaches of contract? A breach is material when it goes to "the essence of the contract." *Neptune Research & Dev., Inc. v. Teknics Indus. Sys., Inc.*, 563 A.2d 465, 470 (N.J.Super.Ct.App.Div.1989). "[A] material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance." *Magnet Res., Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 981 (N.J.Super.Ct.App.Div.1998).

*5 NLR's failure to reach a definitive agreement by October 15, 2013, and to acquire Showboat by January 31, 2014, would go to the heart of the License Agreement.

The License Agreement, which was intended to govern the relationship between CDI and NLR, provides that CDI will operate as "the exclusive vendor *to Showboat* of internet gaming and online gambling services *after* the consummation of NLR's acquisition *of Showboat.*" (License Agreement, Whereas Cl. No. 3, p. 1) (emphasis added). The acquisition of Showboat by NLR was integral to the agreement between the parties: CDI's agreement with NLR to provide online gaming services for Showboat meant nothing unless NLR acquired Showboat. That proposition seems obvious enough, but it is also continually reaffirmed in the express terms of the License Agreement.

CDI, for its part, was obligated to develop the online gaming system while NLR was negotiating and signing an acquisition deal for Showboat. (*See* Compl. ¶ 15.) All of the rest of CDI's performance—*e.g.,* installing and operating the online gaming systems—was to take place after NLR acquired Showboat. In short, the very essence of the License Agreement was the provision of internet gaming systems specifically for use *at Showboat.* Without Showboat, there was no casino to which CDI could provide the agreed-upon gaming services. The failure by NLR to acquire Showboat, then—*if* proven, and *if* not excused by, *e.g.,* a breach by CDI—would constitute a fundamental and material breach. And such a material breach might well excuse CDI from its responsibility to launch the online gaming system by April 2, 2014.

But wait a minute, says NLR; it was only CDI's breach of the License Agreement or failure to deal in good faith that prevented NLR from consummating the acquisition. CDI, says NLR, was obligated to place the $7.5 million "Rights Fee" in escrow, and the absence of that money caused the acquisition deal to break down. (3PCC ¶ 37) So CDI, not NLR, is guilty of breach, according to Counts One and Two of the counterclaim.

NLR, it must be said, breezes past some important contractual language. The License Agreement did not simply require CDI to pay $7.5 million to NLR for the purpose of acquiring Showboat. Rather, the Rights Fee provision states that on the first business day *after* NLR had entered into a *definitive agreement* to acquire Showboat, CDI would place $7.5 million in an escrow account. NLR was permitted to use only $1 million of that money as a deposit for the acquisition of Showboat. (License Agreement § 10(e)(i)). The remaining $6.5 million would not be released until after the acquisition was consummated.[4]

As for breach of the express terms of the contract, a "definitive agreement" with Caesars to acquire Showboat

was the trigger—the condition precedent—for CDI's obligation to place $7.5 million into escrow. A "definitive agreement" is not itself a defined term. NLR alleges that in December 2013 (not October, as agreed) Ribis "advised" CDI that he was "prepared" to enter into such an agreement, and sent CDI a "draft press release" announcing it. (3PCC ¶ 24) Not the same thing. (And the parties have not explored the issue of whether the October deadline was essential.) But as an allegation, this is barely sufficient to withstand a motion and warrant discovery of the circumstances surrounding whatever agreement had been reached.

*6 Relatedly, NLR alleges that CDI's actions, even if they did not breach the literal terms of the License Agreement, breached the implied covenant of good faith and fair dealing, and unfairly deprived NLR of the benefits of the contract.

The crux of that allegation appears to be that CDI lacked the ability and intent to perform, but merely used NLR and Ribis to gain an entree to the casino industry. CDI knew, NLR alleges, that the posting of the $7.5 million was a precondition to the imminent Showboat deal. CDI's refusal to place the $7.5 million in escrow, says NLR, (a) masked CDI's inability to supply the goods and services contracted for ("CDI completely and utterly lacked the technical capabilities to carry out those responsibilities identified in Article 3." (3PCC ¶ 19)); and (b) actually resulted from CDI's decision to negotiate another partnership agreement with Saratoga Casino 8b Raceway (3PCC ¶¶ 28–30). Again, these allegations are factually very thin. I nevertheless think they are sufficient to permit the case to go forward, so that the issues can be explored on a motion for summary judgment.

I will therefore deny CDI's motion for judgment on the pleadings dismissing Count One (breach of contract) and Count Two (breach of the implied covenant of good faith and fair dealing) of NLR's Counterclaim.

### B. Motions of CDI and Carstanjen to Dismiss Counterclaim/Third–Party Claim Count Three (Defamation/Trade Libel/Slander)

In Count Three, NLR and Ribis bring a claim of "defamation/trade libel/slander" as a third-party claim against Carstanjen and as a counterclaim against CDI. Carstanjen is alleged to have uttered defamatory falsehoods in his capacity as president and chief operating officer of CDI. Both Carstanjen and CDI seek to dismiss Count Three.

#### 1. *Rule 14(a)—Carstanjen*

Before considering the merits of the defamation claims, I must deal with a threshold procedural issue. Carstanjen moves to dismiss the Third–Party Complaint on the grounds that it is procedurally improper under Federal Rule of Civil Procedure 14(a). (Dkt. No. 22 p. 5–7)[5] That is correct as far as it goes, but I will nevertheless deny the motion because I find that joinder would be appropriate under Federal Rule of Civil Procedure 20, made applicable via Rule 13(h).

Rule 14(a) provides that a defendant "may, as a third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed.R.Civ.P. 14(a)(1). A claim can be asserted under that rule only "when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to [the] defendant." Wright 8b Miller, *Fed. Prac. & Proc.* § 1446. To properly invoke Rule 14(a), then, a third-party plaintiff must set forth a claim of secondary liability under a theory of indemnification, contribution, or other theory of derivative liability. *See Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 376 (1978) ("A third-party complaint depends at least in part upon the resolution of the primary lawsuit."); *see also Fed. Deposit Ins. Corp. v. Bathgate, II,* 27 F.3d 850, 873 (3d Cir.1994); Wright & Miller, *Fed. Prac. & Proc.* § 1446 (noting that the test for joinder under Rule 14(a) is not transactional and does not depend on the same set of facts being relevant to the original and third-party claims; rather, joinder requires derivative or secondary liability).

*7 Here, NLR's claim against Carstanjen is not premised on theories of secondary liability. The original complaint asserts causes of action against NLR for breach of the License Agreement and fraud. NLR's claim against Carstanjen is for defamation and trade libel. NLR is asserting an independent tort against Carstanjen, not seeking indemnification or contribution. It is not alleged, for example, that if NLR is liable to CDI for breach of contract or fraud, it may pass along that liability to Carstanjen. Rule 14(a), then, is not a proper basis for adding to this action a defamation claim against Carstanjen.

I nevertheless find that the claim against Carstanjen is properly in this action. No one disputes that the defamation claim is permissibly pled as a counterclaim against CDI. *See* Fed.R.Civ.P. 13(a), (b). And that counterclaim provides a basis for adding this parallel (indeed, identical) defamation claim against Carstanjen.

Federal Rule of Civil Procedure 13(h) provides that

"Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." The naming of Carstanjen in Count Three may be viewed as precisely that: the addition of a person as a party to a counterclaim. So viewed, this is, at a minimum, a case of permissive joinder under Rule 20, Fed.R.Civ.P.[6] Rule 20(a)(2) states

(2) *Defendants.* Persons ... may be joined in one action as defendants if:

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all defendants will arise in the action.

Rule 13(h) means that the party joinder rules, Rules 19 and 20, apply to a counterclaim the same way that they apply to a complaint. Here, NLR, (counterclaim) plaintiff, asserts Count Three, a defamation claim, against CDI, (counterclaim) defendant. Count Three is asserted against Carstanjen as well. Indeed, Carstanjen is alleged to have uttered the defamatory statements in his capacity as president and COO of CDI. Clearly, any right to relief is "asserted against [Carstanjen and CDI] jointly, severally, or in the alternative" with respect to the same alleged acts of defamation. Likewise, the defamation claims against these two are certain to involve common "question [s] of law or fact." Fed.R.Civ.P. 20(a)(2).

In short, the defamation claim against Carstanjen is properly joined to this action under Rules 13(h) and 20(a)(2). Carstanjen's motion to dismiss it on Rule 14 grounds is denied.

### 2. Failure to state a claim (defamation/trade libel)

Both CDI and Carstanjen move to dismiss Count Three for failure to state a claim—CDI, which has answered, seeks dismissal under Rule 12(c), and Carstanjen under Rule 12(b)(6). As discussed above, the standards for dismissal under those rules are identical. (*See* pp. 5–6, *supra.*) Count Three is denoted as "Defamation/Trade Libel/Slander." (3PCC p. 17) Written and oral defamation, as well as trade libel, are largely parallel for present purposes.

In order to state a claim for defamation under New Jersey law, "a plaintiff must show that the defendant (1) made a false and defamatory statement concerning the plaintiff, (2) communicated the statement to a third party, and (3) had a sufficient degree of fault." *Mangan v. Corp. Synergies Grp., Inc.,* 834 F.Supp.2d 199, 204 (D.N.J.2011).[7] Trade libel, a somewhat amorphous designation, encompasses defamation especially directed to the plaintiffs trade or business. *See Patel v. Soriano,* 848 A.2d 803, 834 (N.J.Super. Ct.App. Div. 2004) (discussion of the contours of the tort). To make out a trade libel claim, a plaintiff must establish "(1) publication; (2) with malice; (3) of false allegations concerning its property, product or business; and (4) special damages, *i.e.,* pecuniary harm." *Mayflower Transit, LLC v. Prince,* 314 F.Supp.2d 362, 378 (D.N.J.2004).

*8 Whether a statement is defamatory is fact-specific: it requires an analysis of "(1) the content, (2) the verifiability, and (3) the context" of the allegedly defamatory statement. *Leang v. Jersey City Bd. Of Educ.,* 969 A.2d 1097, 1113 (N.J.2009). Factual statements are those capable of verification, *i.e.,* proof of truth or falsity in relation to external realities; opinion statements are not capable of such verification because they reflect only one's state of mind. *See Ward v. Zelikovsky,* 643 A.2d 972, 979 (N.J.1994). New Jersey also recognizes a distinction "between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." *Id.* Only where the allegedly defamatory statements imply reasonably specific assertions of fact will the claim be allowed to proceed. *See id.*

Count Three alleges that Carstanjen called Ribis a "fraud" and a "thief," and said that he was "untrustworthy." (3PCC ¶ 48) Such statements are potentially defamatory. Such accusations—particularly, as here, in the context of identified business dealings—might be susceptible of verification or falsification, and might reflect on Ribis's business. Alternatively, of course, the context might reveal that such statements, if they occurred, were nothing more than name-calling. *See Glass v. Snellbaker,* 2007 WL 1723472, at *9 (D.N.J. June 14, 2007). I will, however, allow the parties to develop that factual context.

To adequately allege the communication or publication element, a plaintiff should "plead facts sufficient to identify the defamer and the circumstances of publication." *Mangan,* 834 F.Supp.2d at 204 (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 563 A.2d 31, 46 (N.J.1989)). Count Three names Carstanjen as the defamer, but is vague as to the who, when, and where of publication. To survive summary judgment, far more will be required. A federal complaint, however, need not set forth the names of the specific individuals to

whom the allegedly defamatory statements were made. *See DiAntonio v. Vanguard Funding LLC,* 2015 WL 3629539, at *4 (D.N.J. June 10, 2015) (sufficient to allege that named individuals, in a particular 6–month period, made the slanderous statement to high officials of plaintiff's new employer, and that he was forced to defend himself as a result); *DeFalco v. N.J. Semi–Conductor Prods., Inc.,* 2012 WL 161801, at *3 (D.N.J. Jan. 19, 2012) (finding communication element established where defamatory statements were made via telephone call to prospective employers). All that is alleged in this Third–Party Complaint is that the allegedly defamatory statements were made to "third parties in the casino industry." (3PCC ¶ 48) Like the complaints in *DiAntonio* and *DeFalco,* this generically defines a class of persons who heard the defamatory statement. The "casino industry" is rather nebulous, but I will permit the claim to go forward so that the particulars—if they exist—may be developed in discovery.

The third element of defamation is a sufficient degree of fault. Defamation requires a showing of actual malice where the victim is a public figure and negligence for a private figure. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80 (1964); *Costello v. Ocean Cnty. Observer,* 643 A.2d 1012, 1021 (N.J.1994). Ribis is a private figure and the negligence standard would apply. As for trade libel, however, the standard is malice: *i.e.,* that the defendant knew that the statements were false or made the statements "with reckless disregard for their falsity." *Pactiv Corp. v. Perk–Up, Inc.,* 2009 WL 2568105, at *10 (D.N.J. Aug. 18, 2009) (citing *Floorgraphics, Inc. v. New Am. Marketing In–Store Servs., Inc.,* 2006 WL 2846268, at *6 (D.N.J. Sept. 29, 2006)); *see also* Restatement (Second) of Torts § 623A Section d (1977).

*9 Here, as elsewhere, Count Three makes a threadbare and generic allegation: "Carstanjen was motivated by actual malice, either knew these statements were false or recklessly disregarded their falsity, and otherwise acted negligently in making these statements." (3PCC ¶ 49). I am mindful, however, that a party's state of mind often cannot be demonstrated directly; for that reason, even as to the heightened pleading requirements for fraud (not applicable here), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

The pleadings set forth a factual context in which the parties had significant face-to-face business dealings. From such allegations, it is possible to extract an allegation that Carstanjen knew or should have known the true facts. Accordingly, an accusation of dishonesty, if false, might be found to be negligent or reckless, depending on the context.

Finally, I discuss the element of damages. General defamation does not have a special or particularized damages element. Slander and trade libel, however, may require a showing of special damages:[8] proof of items such as "the loss of particular customers by name, or a general diminution in its business and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Juliano v. ITT Corp.,* 1991 WL 10023, at *6 (D.N.J. Jan. 22, 1991); *Bocobo v. Radiology Consultants of South Jersey, P.A.,* 477 Fed.Appx. 890, 901 (3d Cir.2012) (upholding summary judgment for defendants on trade libel claim for lack of showing of damages); *Arista Records, Inc. v. Flea World, Inc.,* 356 F.Supp.2d 411, 428 (D.N.J.1995) (finding allegations that defendants were "damaged" and that statements "curtail[ed] legitimate business" were insufficient).

Count Three alleges that "NLR has suffered damages," that the statements "devastat[ed]" and "tended to blacken and injure" Ribis's reputation, and that they "damage[d] his business." As a result, Ribis himself allegedly suffered "damages, including extreme mental anguish and distress." (3PCC ¶¶ 50–52) Once again, these allegations are quite thin, and far more will be required at the summary judgment stage. But I find these allegations of damages adequate to sustain the Count for the time being.

Accordingly, the Rule 12(b)(6) and 12(c) motions to dismiss Count Three of the Counterclaim/Third–Party Complaint for failure to state a claim are denied.

### C. CDI's Rule 12(c) Motion for $2.5 Million Judgment

Finally, I turn to CDI's Rule 12(c) motion which, based on the pleadings alone, requests that the Court enter judgment for $2.5 million on Count 1 of the complaint (breach of contract).

This kind of motion—we might deem it an "offensive Rule 12(c) motion"—is not akin to a motion to dismiss. *Compare* pp. 5–6, *supra.* Rather, it resembles a plaintiff's motion for summary judgment in advance of discovery. The premise of such a motion is that the answer has admitted or failed to deny the essential facts, and that the plaintiff is entitled to judgment as a matter of law. *See Hayes v. Cmty. Gen. Osteopathic Hosp.,* 940 F.2d 54, 56 (3d Cir.1991) (citing 5A Wright & Miller, *Fed. Prac. & Proc.* § 1368, at 519 (2d ed.1990)). Such a motion, a relic of the common-law pleading era, is of limited use today.

*Id.* It would be an unusual case where the admissions of the answer disposed of the merits, leaving nothing for discovery.

***10** CDI, it is true, has adequately pled the existence of the License Agreement, a breach by NLR, and damages. The License Agreement provides for liquidated damages of $2.5 million if NLR fails to consummate the acquisition of Showboat by January 31, 2014. (License Agreement § 10(d)(i))

The issue of CDI's entitlement to judgment, however, is tied up with the issues raised by the Counterclaim: essentially, whether CDI's breach of the agreement would excuse NLR's failure to perform. And even if I granted CDI's 12(c) motion to dismiss that counterclaim, I would necessarily do so without prejudice to the submission of an amended pleading. *See Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004) (where a complaint is dismissed on Rule 12(b)(6) grounds, "a District Court must permit a curative amendment, unless an amendment would be inequitable or futile"). So any judgment "on the pleadings" would be a contingent one, subject to vitiation by an amended pleading that put the issue of breach back in play.

I therefore deny CDI's Rule 12(c) motion for judgment on the pleadings on Count I of CDI's complaint.

## CONCLUSION

For the reasons stated above, Third–Party Defendant Carstanjen's motion to dismiss the Third–Party Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is **DENIED.** CDI's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is likewise **DENIED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5854134

## Footnotes

1. Citations to the record will be abbreviated as follows:
   Compl. = CDI's Complaint, Dkt. No. 1–1
   Answer = NLR's Answer to CDI's Complaint, Dkt. No. 11 at pp. 1–9
   3PCC = NLR's Counterclaims and Third–Party Complaint, Dkt. No. 11 at pp. 9–19

2. The parties do not seem to dispute that the License Agreement's reference to "January 31, 2013" is a typographical error.

3. Herein, Counts One, Two, and Three refer, not to the Complaint, but to the combined Counterclaim/Third–Party Complaint (Dkt. No. 11 at pp. 9–19), unless otherwise specified.

4. NLR was obligated to "execute a definitive agreement to acquire Showboat by October 15, 2013 and consummate the transactions contemplated thereby by January 31, 201[4]." (*Id.* § 3(i))
   The Rights Fee provision, which keys to those two obligations, reads as follows:
   i. On the first Business Day following the date NLR enters into a definitive agreement to acquire Showboat, (A) the parties shall enter into an escrow agreement ... for the establishment of an escrow account, and (B) CDI shall deposit $7,500,000 (the "Escrow Amount") into the escrow account established by such agreement to secure the obligations of CDI to NLR pursuant to Section 10.e.ii. NLR is permitted to use $1,000,000 of escrowed funds as a deposit as provided for in that certain definitive purchase agreement for the acquisition of Showboat.
   ii. On the first Business Day following the date NLR consummates the acquisition of Showboat, the Parties shall execute a joint instruction to the Escrow Agent to release the Escrow Amount to NLR.
   *Id.* § 10(e)(1) & (ii).

5. Carstanjen's motion is styled as a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. Subject matter jurisdiction, however, is a separate question. Rule 14(a)—like all of the federal rules—is not jurisdictional, but procedural. *See* Fed.R.Civ.P. 82 ("These [Federal Rules of Civil Procedure] do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts."); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* 2d § 1446 (2007) [hereinafter Wright & Miller, *Fed. Prac. & Proc*]. The Counterclaim/Third–Party Complaint alleges, though not very specifically, that jurisdiction over the Third–Party Complaint rests on diversity. (3PCC ¶ 5; *see* 28 U.S.C. § 1332.) Should discovery disclose that the parties'

citizenship is not diverse or that the amount in controversy does not exceed $75,000, the parties shall immediately bring those facts to the Court's attention.

6  That being the case, I do not consider whether it is required to be joined under Rule 19.

7  Although New Jersey imposes a heightened pleading standard whereby a claimant must allege the specific defamatory words used, in this Court the ordinary federal pleading standard applies. *Mangan,* 834 F.Supp.2d at 204 (noting that a plaintiff "must allege the elements of defamation as applied by New Jersey law to a degree of sufficient specificity to satisfy the standards outlined in Rule 8.")

8  I do not undertake here to discuss the current state of slander *per se* and the complexities of special and presumed damages.

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.